## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

GERALD A. MASTAW, M.D.,
             Plaintiff,

      v.                                                     Case No: 3:20cv5888-RV/EMT

WEST FLORIDA MEDICAL CENTER
CLINIC, P.A., and JAMES FROST, M.D.,
             Defendants.
_____/

## <u>ORDER</u>

The plaintiff, Gerald A. Mastaw, M.D., has filed this action against his former
employer, West Florida Medical Center Clinic, P.A. (MCC), and James Frost, M.D.
(together, the defendants). He alleges breach of contract (count 1); retaliation under
the Family Medical Leave Act (FMLA) (count 2); violations of the Americans with
Disabilities Act (ADA) (count 3); and state law defamation (count 4). Discovery is
closed, and the defendants have filed a motion for summary judgment (doc. 36). The
plaintiff has filed a response and declaration in opposition, and the defendants have
filed a reply thereto.

### I. Standard of Review

Summary judgment is appropriate if all the pleadings, discovery, affidavits,
and disclosure materials on file show there is no genuine disputed issue of material
fact, and the movant is entitled to judgment as matter of law. Fed. R. Civ. P. 56(a),
(c). The plain language of Rule 56 mandates the entry of summary judgment, after
adequate time for discovery and upon motion, against any party that fails to make a
showing sufficient to prove the existence of an element essential to that party's case
and upon which that party will bear the burden of proof at trial. *Celotex Corp. v.
Catrett*, 477 U.S. 317, 322 (1986).

Summary judgment is inappropriate "[i]f a reasonable factfinder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact[.]" *Allen v. Board of Public Educ. for Bibb Cty.*, 495 F.3d 1306, 1315 (11th Cir. 2007). An issue of fact is "material" if it might affect the outcome of the case under the governing law. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986). It is "genuine" if the record, viewed as a whole, could lead a reasonable fact finder to return a verdict for the non-movant. *Id.* In considering a motion for summary judgment, the non-movant's evidence is to be believed and all reasonable inferences drawn in his favor. *Id.* at 255.

Employment discrimination claims are fact-intensive, but it is well established that "the summary judgment rule applies in job discrimination cases just as in other cases. No thumb is to be placed on either side of the scale." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1086 (11th Cir. 2004); *accord Abdu-Brisson v. Delta Air Lines*, 239 F.3d 456, 466 (2d Cir. 2001) ("[I]t is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases.").

## II. Background

Despite the parties' lengthy summary judgment filings, the pertinent facts can be set forth briefly. These facts are either undisputed or, if disputed, resolved in the plaintiff's favor where supported by evidence in the record.

The plaintiff is a pain management doctor. In or about 2010, he was diagnosed with Post-Traumatic Stress Disorder (PTSD) caused by his prior military service and deployment to Iraq. In August 2013---about three years after his PTSD diagnosis--- he was hired by MCC as an associate physician. He was later elevated to shareholder, and he entered into a Shareholder Employment Agreement (Agreement) at that time. The Agreement provided that the terms of his employment would be governed by MCC's Bylaws, which were incorporated therein. The Bylaws established detailed policies and procedures for addressing disciplinary issues.

Under the Bylaws, a disciplinary proceeding can be initiated by any person if there are grounds for discipline pursuant to Section 18.02. That section provides that a practitioner is subject to discipline if his "activities or professional conduct" are:

(1) Detrimental to patient safety or to the delivery of quality patient care;

(2) Below applicable professional standards;

(3) Contrary to applicable standards of professional ethics;

(4) Contrary to applicable legal requirements;

(5) Contrary to the Corporation's Code of Conduct (as then in effect);

(6) Contrary to the Corporation's bylaws; or

(7) Disruptive to the Corporation's operations or to the delivery of health care.

The subject of the charge must be notified in writing (and provided a copy of the charge) within 48 hours. Once a disciplinary proceeding has begun, the Medical Director will interview the practitioner and provide a report to the Board of Directors (the Board) within 10 days thereafter. After the report is received, and if the Board determines that any material facts are in dispute, the Board will generally hold a fact-finding hearing and perform an investigation into the matter. The practitioner shall be notified and afforded an opportunity to provide information. Despite the status of any investigation, however, the Bylaws explicitly provide that the Board shall at all times retain the authority and discretion to take whatever action is warranted by the circumstances, including *inter alia* "termination of the investigative process or other action."

The Bylaws provide that the Board's actions may include, without limitation:

(1) Determining no corrective action will be taken and, if the Board of Directors determines there was no credible evidence for the complaint in the first instance, removing any adverse information from the practitioner's file;

(2) Deferring action for a reasonable time where circumstances warrant, not exceeding thirty (30) days;

(3) Issuing letters of admonition, censure, reprimand, or warning, although nothing herein shall be deemed to preclude department chairs from issuing written or oral warnings to the affected practitioner outside of the mechanism for corrective action. In the event such letters are issued, the affected practitioner may make a written response, which shall be placed in the practitioner's file;

(4) Imposing monetary sanctions in the form of a fine;

(5) Determining terms of probation or special limitations upon practice, including, without limitation, requirements for mandatory consultation or monitoring or the practitioner's completion of specific conditions or requirements;

(6) Termination of employment contract;

(7) Referring the matter to the Corporation's Shareholders for expulsion of the practitioner;

(8) Taking other actions deemed appropriate under the circumstances.

The Board of Directors' determination of the appropriate discipline shall become effective as the final decision of the Board of Directors.

Particularly relevant to this case, Article XVIII of the Bylaws concludes with the following (emphasis added):

> Notwithstanding anything in this Article XVIII or in these Bylaws to the contrary, *any action of the Corporation which must comply with the provisions of the Health Care Quality Improvement Act of 1986 (42 U.S. Code §§11101 et seq.) [HCQIA or Act] shall follow procedures required under the Act, the results of which shall be reported as required under the Act.*

The defendant, Dr. Frost, is a medical doctor and a shareholder of MCC. He was also MCC's Medical Director and served as an advisor to the Board. During the time period relevant to this case, Andy Popple was MCC's Executive Vice President. The plaintiff alleges---and for purposes of summary judgment I accept as true---that Popple was a "bully" with a very abrasive, aggressive, and erratic management style.

In or about early 2019, the Board received a "letter of concern" and numerous complaints regarding the plaintiff's practice. The concerns and complaints included frequent tardiness and absenteeism; behavior issues; lack of attentiveness; excessive cell phone use; not putting patients first; and failure to comply with certain statutory obligations. The Board reviewed the letter and determined that a Correction Action Plan (CAP) was warranted. The CAP identified corrective measures that the plaintiff was required to take to improve his clinical practice and comply with his obligations. He alleges that the issues identified in the CAP stemmed from his PTSD, which was exacerbated by Popple and his management style. Nevertheless, the plaintiff agreed to the terms of the CAP and executed the agreement on March 21, 2019.[1] The CAP explained that noncompliance with the CAP would result in additional disciplinary

---

[1] The plaintiff conceded during deposition that MCC brought some of the concerns to his attention "multiple times in the past." Further, he doesn't really dispute them (or at least not all of them); he mostly takes issue with some of the *wording* of those concerns. For example, one of the concerns was his "frequent" tardiness and absenteeism. The plaintiff readily admits that he was sometimes tardy and absent from work, which required that his appointments be cancelled or rescheduled. He just questions whether it was "frequent" because he maintains that is a "vague word."

action by the Board pursuant to the Bylaws, including termination and the need to report certain disciplinary actions to the National Practitioner Data Bank (NPDB).

In or about August/September 2019, the plaintiff asserts that Popple triggered his PTSD symptoms, so he requested leave under the FMLA. Specifically, he asked that he be allowed to take 30-60 minute breaks during the day to deal with any "flare-ups" of his PTSD whenever they presented, along with a one hour counseling session per week with his mental health counselor, Marci Shemaria. MCC granted this request. In addition, on September 12, 2019, the plaintiff (through his attorney) requested an accommodation under the ADA. The requested accommodation was for him to have a "direct report supervisor" who would report to the Board so that he (plaintiff) could be separated from and have little or no contact with Popple. MCC did not accommodate this latter request. In fact, the plaintiff contends that they tried to "force" him to have a meeting with Popple, which further triggered his PTSD.

Consequently, on September 22, 2019, the plaintiff told his practice manager via text message that he wouldn't be at work the next day because he had to attend an emergency counseling session. The following day, September 23, 2019, he again sent his manager a text message advising that he had to attend emergency counseling and would not be able to work the next day, September 24th. MCC had to cancel all his patients for both days.

The plaintiff returned to work on September 25, 2019, and he began to see patients without providing Dr. Frost documentation or information to confirm that he could safely treat patients after his self-declared need to have emergency sessions with his counselor over the prior two days.[2] Dr. Frost attempted to speak with the

---

[2] The record contains a letter from Shemaria, dated September 24, 2019, indicating that the plaintiff was able to return to work and care for patients as long as he was not exposed to "similar triggering circumstances." The letter was addressed to the Chairman of MCC's Board of Directors, and Dr. Frost testified (and plaintiff does not appear to dispute) that he never saw it until he was preparing for his deposition.

plaintiff on the morning of September 25th to address the situation (because he claims he had concerns about plaintiff's ability to provide safe patient care), but the plaintiff refused to speak to him about it because he had patients to see. Dr. Frost immediately suspended him, and shortly thereafter the Board held a meeting in accordance with the Bylaws (which the plaintiff attended). The Board determined that in light of the plaintiff's behavior and alleged insubordination, and in the interest of patient safety, his suspension would continue until he provided an appropriate medical evaluation prepared by a qualified medical doctor to confirm that he could safely treat patients. Once the plaintiff was suspended for more than 30 days, MCC was obligated by law to report this fact to the NPDB, which it did.

During the plaintiff's suspension, Dr. Andrew Van Brocklin---another pain management doctor at MCC---provided interim care for his patients. This entailed reviewing the plaintiff's charts. The defendants contend that the chart review raised questions about the plaintiff's treatment of his patients, particularly his practice of prescribing controlled substances. Dr. Frost performed a professional review of 50 of the plaintiff's patients, and the review allegedly revealed (but the plaintiff denies) that he had failed to comply with the objective legal requirements that govern a pain management practice, *e.g.*, requiring urinalysis testing of certain patients; review of test results; and documentation to support the prescriptions that he was ordering and refiling. Dr. Frost presented his findings to the Board, which held a hearing and then terminated the plaintiff.

The plaintiff originally filed this case in Florida state court, alleging breach of contract; FMLA retaliation; violation of the ADA; and defamation under state law. The defendants removed the action to this federal court. Early on, the plaintiff moved for summary judgment on his breach of contract claim. He argued that he had been entitled to (but was denied) a proper hearing under the HCQIA and MCC's Bylaws. This, he maintained, breached the terms of the Agreement, which was the basis for

the breach of contract cause of action. I rejected the plaintiff's argument by written order dated May 3, 2021 (doc. 18), agreeing with the defendants that:

> MCC's Bylaws provide that "[n]otwithstanding anything in this Article XVIII or in these Bylaws to the contrary, any action of the Corporation which must comply with the provisions of the [HCQIA] shall follow procedures required under the Act, the results of which shall be reported as required under the Act." *See* Bylaws § 18.09(e).  As stated above, MCC is not required to comply with the provisions of the HCQIA regarding disciplinary review proceedings.  *MCC is, however, required by law to transmit certain information in a specified form and procedure to the Board of Medical Examiners*, including reports of any applicable adverse professional review actions taken against a physician.  *See* 42 U.S.C. § 11133(a)(1)(A); § 11134 (emphasis added).
>
> *The reference in the Bylaws to the HCQIA unambiguously refers to these mandatory reporting obligations, not to MCC's own policies and procedures applicable to disciplinary proceedings.*  Under Dr. Mastaw's interpretation, the detailed procedures set forth in multiple subsections within Section 18 of the Bylaws regarding disciplinary proceedings, investigations and requirements would be rendered superfluous. This interpretation would "ignore[] the cardinal principle of contract interpretation which requires that a contract be read and interpreted as a whole, finding meaning in all parts if possible, while finding meaning in the whole." *Metric Systems Corp. v. McDonnell Douglas Corp.*, 850 F. Supp. 1568, 1585 (N.D. Fla. 1994) (internal citation omitted). Therefore, MCC's obligations under the Bylaws are not augmented in any way by reference to the HCQIA's reporting requirements.

*Id.* at 4 (emphasis original).

Discovery is complete and, as previously noted, the defendants now move for summary judgment.

## III. Discussion

### A. Breach of Contract

As the defendants argue in their motion for summary judgment, the plaintiff's breach of contract claim is without merit and based on a fundamental misreading of the Agreement and Bylaws. I have previously considered this issue and ruled against the plaintiff's claim. Therefore, summary judgment must be, and is, granted in favor of the defendants on this claim for the reasons stated in my May 3rd order.[3]

### B. FMLA Retaliation

When a plaintiff asserts a claim of retaliation under the FMLA, in the absence of direct evidence of the employer's intent, courts generally apply the same burden-shifting framework used for Title VII discrimination claims set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Strickland v. Water Works & Sewer Bd. of City of Birmingham*, 239 F.3d 1199, 1207 (11th Cir. 2001). "In order to state a claim of retaliation, an employee must allege that: (1) he engaged in a statutorily protected activity; (2) he suffered an adverse employment decision; and (3) the decision was causally related to the protected activity." *Id.*

After the plaintiff establishes his prima facie case, the burden then shifts to the employer to rebut the presumption of retaliation by giving a legitimate and non-discriminatory reason for the employment decision. *See Holifield v. Reno*, 115 F.3d 1555, 1564 (11th Cir. 1997). This intermediate burden is exceedingly light and, once it has been met, the burden shifts back to the plaintiff. *Id.* at 1564-65.

---

[3] The plaintiff acknowledges my prior ruling, as he must. However, he suggests it is not controlling here because there I was considering *his* motion for summary judgment, but now the defendants have moved for summary judgment so "the standards for disputes of facts are reversed" and thus a different result is warranted. That may be true if my previous ruling had been based on a disputed question of fact that I was required to resolve against the plaintiff at that time. But it wasn't. My ruling was instead based on an objective, plain, and common sense reading of the Agreement and Bylaws.

At the third and final stage of the *McDonnell Douglas* analysis, the plaintiff must establish with "significantly probative evidence" that the stated reason for the adverse job action was merely a pretext for retaliation. *See, e.g., Brooks v. County Commissioners of Jefferson County, Ala.*, 446 F.3d 1160, 1163 (11th Cir. 2006). The Eleventh Circuit has repeatedly stressed that in attempting to show pretext, a plaintiff cannot simply quarrel with the wisdom of the employer's reason; instead, as long as the reason "is one that might motivate a reasonable employer" to do what it did, the plaintiff "must meet that reason head on and rebut it." *See Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000). A proffered reason will not be found to be a pretext for discrimination "unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 515 (1993); *accord Springer v. Convergys Customer Mgmt. Group*, 509 F.3d 1344, 1349 (11th Cir. 2007) (same); *see also Alvarez v. Royal Atlantic Devs. Inc.*, 610 F.3d 1253, 1264 (11th Cir. 2010) ("Showing only that the employer's proffered reason is false does not necessarily entitle the plaintiff to get past summary judgment.").

Ultimately, in analyzing discrimination claims, district courts must be careful not to allow plaintiffs to litigate whether they were good employees who deserved better treatment. *Rojas v. Florida*, 285 F.3d 1339, 1342 (11th Cir. 2002); *accord, e.g., Alvarez,* 610 F.3d at 1266 (noting "the fact that [an employee] thinks more highly of her performance than her employer does is beside the point"). The issue is not the wisdom or accuracy of the employer's action, nor are courts concerned with whether it was prudent or based upon valid grounds. *Alvarez,* 610 F.3d at 1266 ("The inquiry into pretext centers on the employer's beliefs, not the employee's beliefs and, to be blunt about it, not on reality as it exists outside the decision maker's head."). Instead, the court's "sole concern" is whether unlawful discriminatory animus motivated the employment action. *Id.* Simply put, the law doesn't require an employer's decisions to be reasonable or fair:

> We do not sit as a "super-personnel department," and it is not our role to second-guess the wisdom of an employer's business decisions—indeed the wisdom of them is irrelevant—as long as those decisions were not made with discriminatory motive. That is true no matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers.

*Id.* (citations and brackets omitted).

Summary judgment is appropriate on the FMLA retaliation claim. Assuming *arguendo* that the plaintiff has established his prima facie case, the defendants have discharged their "exceedingly light" intermediate burden by providing a legitimate and non-discriminatory reason for the suspension and subsequent termination, *i.e.*, they believed that the plaintiff was not safely and properly treating his patients. The plaintiff must come forward with "significantly probative evidence" that the asserted reason was merely a pretext for retaliation. He must establish from evidence in the record that the stated reason was *both* false *and* that FMLA retaliation was the real reason. This he has failed to do.[4]

C. *Violation of the ADA*

To establish a prima facie case of disability discrimination under the ADA, the plaintiff must prove that (1) he has a disability; (2) he is a qualified individual; and (3) he was subjected to unlawful discrimination because of his disability. *Davis v. Florida Power & Light Co.*, 205 F.3d 1301, 1305 (11th Cir. 2000). A "qualified

---

[4] For example, in his opposition to summary judgment the plaintiff avers that Dr. Frost had no prior experience with PTSD and was not experienced enough in pain management to conclude that the plaintiff was unfit to serve patients. Even if true, that may at best establish Dr. Frost was *mistaken*. But as earlier noted, I am not concerned with whether his reasons were good or bad; right or wrong; fair or unfair. Instead, my "sole concern" is whether there is sufficient evidence (taken as true on summary judgment) that Dr. Frost and MCC were motivated to retaliate against the plaintiff *based on his use of the FMLA.*

individual with a disability" is an individual with a disability who can perform the essential functions of the job with or without a reasonable accommodation. *Id.*

Under the ADA, "reasonable accommodations" may include, *inter alia*, "'job restructuring, parttime or modified work schedules, reassignment to a vacant position . . . and other similar accommodations for individuals with disabilities.'" *Stewart v. Happy Herman's Cheshire Bridge*, 117 F.3d 1278, 1285 (11th Cir. 1997) (quoting 42 U.S.C. § 12111(9)(B)). However, "'the use of the word 'reasonable' as an adjective for the word 'accommodate' connotes that an employer is not required to accommodate an employee in any manner in which that employee desires.'" *Id*. Stated differently, an employee is not entitled to any and all accommodations of his choice, but only to a *reasonable* accommodation. *Id.* at 1286.

As earlier noted, the denied accommodation that the plaintiff requested here was to have a direct report supervisor who would report to the Board so that he could be separated from (and have no contact with) Popple in order to avoid triggering his PTSD. I considered this issue on very similar facts in *Prichard v. Dominguez*, 2006 WL 1836017 (N.D. Fla. June 29, 2006).

The plaintiff in *Prichard* suffered depression relating to threats, harassment, and pressure coming from her direct supervisor, Major Karen A. Finn. Her therapist determined that she needed to be separated from Major Finn and concluded that this requested accommodation was "absolutely necessary for [the plaintiff's] health and well-being." *Id.* at *3. The employer denied her request and she filed suit. In granting summary judgment for the defendant, I held that

> employees may not use the Act---as Plaintiff is attempting here---as the means to obtain a transfer from an undesirable boss. On this issue, there is an overwhelming unanimity of opinion in courts throughout the country.

*Id.* at *13-14 (collecting and quoting from 11 cases from courts around the country and observing that "the above case law, and literally dozens of other cases not cited, make clear that Plaintiff's suggested accommodation was unreasonable as a matter of law"). That law is equally applicable here.

Consequently, as there is no genuine disputed issue of material fact, summary judgment is appropriate on the ADA claim as well.

*D. Defamation*

To establish a cause of action for defamation under Florida law, "a plaintiff must plead and prove that a defendant published (1) false and defamatory statements of and concerning him, (2) without reasonable care as to whether those statements were true or false, (3) resulting in actual damage to the plaintiff." *Smith v. Bendix Field Eng'g Corp.*, 1992 WL 316313, at *3 (M.D. Fla. 1992) (citing *Miami Herald Publishing Co. v. Ane*, 423 So.2d 376 (Fla. 3rd DCA 1982), Restatement (Second) of Torts § 580B (1977)). Even if a statement is false and defamatory, a defendant is not liable for defamation if: (1) the matter is published on an occasion that makes it conditionally privileged; and (2) the privilege is not abused. *See Pierson v. Orlando Regional Healthcare Sys. Inc.*, 2010 WL 1408391, at *9 (M.D. Fla. April 6, 2010) (citing *Nodar v. Galbreath*, 462 So.2d 803 (Fla. 1984)). This privilege has been held to apply to communications between doctors at a hospital regarding another doctor and in statements concerning a doctor's fitness. *See id.* (citing *Magre v. Charles*, 729 So. 2d 440 (Fla. 5th DCA 1999)). To overcome this privilege, a plaintiff must allege and prove "express malice"---that is, "ill will, hostility, and evil intention to injure and defame." *See Demby v. English*, 667 So.2d 350, 353 (Fla. 1st DCA 1995). The Supreme Court of Florida has unequivocally held that all three elements (ill will, hostility and evil intention to defame and injure) and more must be shown. *Boehm v. American Bankers Ins. Group, Inc.*, 557 So.2d 91, 94 (Fla. 3rd DCA 1990) (citing *Nodar,* 462 So.2d at 811 n.8). "It is insufficient that the speaker have generalized

feelings of hostility and malice towards the Plaintiff. Only if the Plaintiff demonstrates the primary motivation for the *statements uttered* was express malice, is the privilege overcome." *Id.* (citing *Nodar*, 462 So.2d at 812 (emphasis original)).

As noted above (and in my prior May 3rd order), MCC was required by law to transmit the information regarding the plaintiff's suspension to the NPDB once it exceeded 30 days. It was a privileged communication, and the plaintiff has failed to produce sufficient evidence of "express malice" (ill will, hostility, and evil intention to injure and defame) to overcome the privilege. Summary judgment is appropriate on this claim, too.[5]

## IV. Conclusion

The defendants' motion for summary judgment (doc. 36) is GRANTED. The clerk is directed to enter judgment in favor of the defendants, along with taxable costs, and close this case.

DONE and ORDERED this 26th day of April 2022

/s/ Roger Vinson
ROGER VINSON
Senior United States District Judge

---

[5] The plaintiff claims "express malice" can be inferred because the defendants failed to reasonably accommodate his request to be separated from Popple, which he contends is evidence of bad faith. As previously stated, however, the requested accommodation was unreasonable as a matter of law.